# STATE OF MICHIGAN

# COURT OF APPEALS

WEBSTER TOWNSHIP,

        Plaintiff/Counter-Defendant-
Appellee,

and

JOHN SCHARF, ANDREA SCHARF, DUNCAN
J.J. MAGOON AND MARILYN J. MAGOON
REVOCABLE TRUST, and SUBHAM
HOLDINGS, L.L.C.

        Intervening Plaintiffs-Appellees,

UNPUBLISHED
June 7, 2016

v

DANIEL WAITZ, LAURA WAITZ, and
COTTONWOOD BARN, L.L.C.,

        Defendants/Counter-Plaintiffs-
Appellants.

No. 325008
Washtenaw Circuit Court
LC No. 2013-000948-CZ

Before: O'CONNELL, P.J., and OWENS and BECKERING, JJ.

BECKERING, J. (*concurring*).

Because I agree that defendants, Daniel Waitz, Laura Waitz, and Cottonwood Barn, L.L.C., are unable to show reasonable reliance with respect to their equitable estoppel claim—which is a form of relief to be applied in exceptional circumstances—I concur in the result reached by the majority opinion. I write separately simply to acknowledge that responsibility for the current situation lies at the feet of both defendants and plaintiff, Webster Township, and to make clear that our ruling pertains to the nature of the use of Cottonwood Barn by defendants, not whether seasonal use of a barn to host weddings or other events that is truly incidental and subordinate to the permitted use of the property can be considered an accessory use within the parameters of the zoning ordinance at issue.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

After successfully restoring and renovating a barn located on his property, Daniel Waitz began looking for another barn to renovate and restore. Unlike the first barn, which he was unable to lease for events due to a deed restriction, Daniel hoped to make this new barn available for lease as an event center at which wedding receptions and similar events could be held. Daniel found what he believed was a suitable project located on Farrell Road in Webster Township. The property, which was zoned as agricultural, contained a home as well as an outdated, dilapidated barn. This property would eventually become known as the "Cottonwood Barn."

On or about July 25, 2012, Daniel met with Webster Township Zoning Administrator Bruce Pindzia to discuss the proposed land use on the property he was considering buying. On August 2, 2012, Pindzia penned a letter to Daniel indicating that he understood Daniel desired to host events in the barn and that the hosting of these events "would be seasonal" and would occur during "the warmer months." Further, it provided that the letter was "your authorization to proceed with this concept based upon the Zoning Ordinance currently in effect." The letter went on to state that the principal structure on the property was the home, and that the barn was "defined as an accessory to the home. The hosting of wedding receptions and similar gatherings is considered to be an accessory use which is incidental and subordinate to the single-family dwelling."[1]

Despite writing a letter of approval, Pindzia wrote to Daniel on August 27, 2012, informing the latter that Pindzia had been:

> asked to gather additional information regarding the 'intensity' anticipated by your activities. Since I didn't have a written application to work from, the circumstances limiting the authorization of such land use were few and may not be clear to others. As such, I am seeking more information from you.

The letter sought responses to eight questions concerning how often Daniel anticipated renting the barn, how many guests would be at events, whether the barn would be rented seasonally or year-round, the number of anticipated employees, whether there would be entertainment, such as a band, offered for events, whether the entertainment would be indoors or outdoors, the hours of operation, and whether the single-family home on the property, which was "assumed to be the primary use of the land," would remain occupied.

---

[1] Daniel did not apply for a preliminary certificate of zoning compliance, which would be required in the event his intended use and development plans were deemed a change in the type of use of the land or occupancy of any building, as compared to a mere accessory use to the residential use of the property. The ordinances applicable to such an undertaking would have required the submission of, among other documents, an application and a site plan. See Webster Township Ordinance, § 3.80. Instead, it appears that he sought approval for his proposed change in the use of the barn solely through his interactions with Pindzia.

Daniel responded on August 31, 2012 by indicating that he anticipated renting the barn for events year-round, that approximately 25-200 guests would attend events, that his wife, Laura Waitz, would manage the event center, and any other employees would likely be "part-time high school kids." In addition, Daniel indicated that he anticipated there would be a band or DJ at many events, and that the entertainment could potentially be outdoors, depending on the weather. Daniel anticipated that events would end at 11 p.m., and that the single-family house located on the property would continue to be occupied. Daniel, who had not yet purchased the property, stated that he was "a little concerned about the timing of this as we are expected to close [on the property] within 30 days. If you foresee any issues I really need to know right away."

The record does not contain a response from Pindzia; however, on September 18, 2012, Webster Township Supervisor John Kingsley e-mailed Daniel and informed him that various township board members had raised "a number of questions" about the proposed change in use of the barn. Kingsley invited Daniel to attend a board meeting that evening, cautioning that "I would not wish for you to close on this property with the feeling that you would be permitted to do as you have proposed without many things being clarified." Kingsley concluded his e-mail by informing Daniel that either he or Pindzia would provide Daniel with more information at some point in the future. Daniel, who was out of town that day, did not attend the board meeting that evening.

The record is silent as to any follow-up communications between the Daniel and Pindzia or Daniel and Kingsley, or between Daniel and any township officials, for that matter. Daniel and Laura purchased the property on October 4, 2012.

In early 2013, Daniel applied for a building permit. The permit described the work to be done as follows: "ADD DORMERS-REPLACE ROOF & FILLING SOME OPENINGS." The estimated cost of construction was listed at $25,000. Pindzia sent an e-mail to Washtenaw County—ostensibly the entity responsible for issuing building permits in Webster Township— indicating that a township zoning permit was not required for the proposed improvements and that the requested building permit should be issued. Thereafter, Washtenaw Township issued a building permit to Daniel for work on the barn.

Daniel subsequently sought a revision of the building permit for interior work on the barn, including flooring work and electrical and plumbing improvements. The estimated cost of construction—$25,000—remained unchanged. On April 29, 2013, Pindzia e-mailed Washtenaw County officials indicating that they should "consider this as your authorization to issue a building permit regarding these improvements." Pindzia's e-mail stated the proposed purpose of the improvements on the barn was "to create an event venue suitable for leasing. Based on the current Zoning Ordinance, I have no difficulty with this."

In May 2013, Washtenaw County issued a revised building permit, again with an estimated cost of construction of $25,000. The revised permit mentioned floor and stairway work, as well as additional window work and the installation of beams and doors. According to Daniel's affidavit, he obtained not only building permits for work on the barn, but also sewage permits, electrical permits, plumbing permits, soil and sedimentation control permits, and mechanical permits.

-3-

The barn was not yet open for business in the summer of 2013. However, neighboring landowners, concerned with the construction, apparently began to complain about the renovation project and proposed use of the barn. On July 22, 2013, Pindzia wrote an e-mail to Webster Township board members and stated that Daniel had misinformed him about the proposed use and nature of the barn. According to the e-mail, "the representations made to me by [Daniel] . . . last year are not the parameters the business is now being run under. In other words, the details and things I see happening today . . . [are] different than what [Daniel] said [he was] going to do." In particular, Pindzia stated that

> the situation was presented to me that the subject property would remain primarily as a single family dwelling with an out building. [Daniel] was going to purchase it. The barn events would be occasional and SEASONAL. No outdoor activities were specified.[2] No building improvements were proposed. All of these conditions have been changed. Massive construction improvements have been made. The business activities are not seasonal but all year long. The primary use of the property has shifted to a Conference Center with a 3 bedroom outbuilding (formerly someone's home).

Pindzia concluded his e-mail by informing board members that any prior authorization given to Daniel was revoked, that Daniel would be subject to an enforcement action, and that the barn would not be afforded non-conforming use status.

Three days later, on July 25, 2013, Pindzia e-mailed Daniel and indicated that he could not locate the list of answers Daniel had given in response to Pindzia's August 27, 2012 letter. Pindzia asked if Daniel could respond to the same eight questions he posed to Daniel in the letter because the township board was exploring the use of historic barns, and he had "been asked to discover more information about your project." Daniel responded to the e-mail with answers that largely mirrored his August 31, 2012 answers, but included responses that increased the potential number of guests at events to 150-300 guests, added additional employees, such as a parking attendant and "[m]aybe a caretaker," and which indicated that events at the barn were to end by 11 p.m., but everyone would be "completely gone by midnight."

Daniel continued construction and renovation on the barn and stated in an affidavit that he had started to accept reservations for events at the barn during the summer, even though the barn was not scheduled to open until October 2013. He averred that he was almost finished with construction when he received a "Notice of Potential Violation" from Pindzia on September 3, 2013. The notice stated that Pindzia considered the barn to "be acceptable if it were conducted as an accessory use to the single family dwelling on the premises." However, the document continued, based "[u]pon clarification" of Daniel's intentions via his most recent e-mail, "it appeared that [Daniel was] proposing much more than an 'accessory use' within the barn on the

---

[2] The record contains no indication from Daniel that the barn would only be used seasonally; rather, his August 31, 2012 letter expressly stated that he intended to host events at the barn on a year-round basis. In addition, Daniel's letter expressly indicated that entertainment at the barn, including a band, was likely to either be indoor or outdoor entertainment.

premises." The document advised Daniel that the intended use of the barn as a commercial, rather than accessory use, was unlawful under township zoning ordinances.[3] It further advised that he was not to pursue his anticipated construction of a parking lot adjacent to the barn, given that a parking lot designed to serve 300 guests represented a change to another use requiring review and approval of a site plan.

Despite the warning about the parking lot, it appears that Daniel pursued construction of the parking lot, prompting a September 10, 2013 stop-work order from Pindzia. The order noted that the parking lot construction was contrary to the earlier warning. It also noted that Daniel began construction on the parking lot without first obtaining prior review or site plan approval.

On September 18, 2013, Washtenaw County issued another revised building permit to Daniel for work on the barn.[4] The permit listed "REMODELING ENTIRE BARN INSIDE & OUTSIDE" in the project description, and listed an estimated project cost of $525,000. It is not apparent from the record why this permit was issued after Daniel received the notice of a potential violation and a stop work order.

On September 25, 2013, Webster Township initiated this action by filing a complaint and alleging that Daniel's use of the property violated township zoning ordinances. Intervening plaintiffs alleged similar ordinance violations and argued that the use of the barn constituted a public nuisance per se, a private nuisance per se, and a trespass. Defendants filed a counterclaim. In October 2014, the trial court granted summary disposition to Webster Township and intervening plaintiffs, concluding that an event barn was not an expressly or impliedly "permitted use" under Section 1.20 of the Ordinance, and as for whether it constituted an "accessory use" to a permitted use, the trial court stated as follows:

> The prior, permitted use of the property was as a residence; the [former occupants] have moved out and, as of the filing of plaintiffs' motion, the house was unoccupied. The events in the barn, however, occur each weekend, from Friday through Sunday and sometimes during the week. They often involve large numbers of people and substantial traffic, all connected with the barn activities. As an accessory use, the tail is now wagging the dog.

* * *

---

[3] In its thorough and well-analyzed October 15, 2014 Opinion and Order, the trial court cogently details the chronology of events that occurred during the relevant time period, including the fact that the Township Planning Commission and Township Board considered, but rejected, proposed changes to the Township Zoning Ordinance that would have addressed the type of use defendants were proposing for their barn, being beyond mere accessory use.

[4] The record does not appear to contain an application for the permit or any other documents associated with the issuance of the permit.

Whether or not the house is occupied, it is clear that event barn use is a commercial operation that exceeds the residential use of the property. The noise, disruption, traffic and activity of which the plaintiffs complain have no connection to the house as a residence. The guests at the events have no relation, generally, to the occupants of the house. The investment in the property was solely, or almost solely, for the purpose of operating a non-agricultural business out of the barn; the owners of the business do not reside on the property.

* * *

. . . The record shows that the event barn became the principal or primary use, and it was, in fact, a change in the type of use—or at least in the type of occupancy—of the property.

The trial court also found that defendants could not establish that they reasonably relied on the township's representation that the event barn, as it developed, was a permitted or accessory use in the agricultural district under the circumstances presented.

## II. EQUITABLE ESTOPPEL

While I agree with the well-reasoned majority opinion, I write separately to briefly discuss defendants' equitable estoppel claim. "An equitable estoppel arises where (1) a party by representation, admissions, or silence intentionally or negligently induces another party to believe facts, (2) the other party justifiably relies and acts on this belief, and (3) the other party will be prejudiced if the first party is permitted to deny the existence of the facts." *Hughes v Almena Twp*, 284 Mich App 50, 78; 771 NW2d 453 (2009). "Generally, a city is not precluded by estoppel from enforcing its zoning code." *Holland v Manish Enterprises*, 174 Mich App 509, 514; 436 NW2d 398 (1988). See also *Pittsfield Twp v Malcolm*, 375 Mich 135, 146-147; 134 NW2d 166 (1965). However, our courts have recognized an exception to the rule of nonestoppel in "exceptional circumstances." *Pittsfield Twp*, 375 Mich at 147. The entire circumstances, viewed together, must present compelling reasons why the zoning authority should not be allowed to enforce the ordinance. *Id*. at 148.

I agree that defendants cannot establish reasonable reliance in this case. Daniel discussed the event-barn concept with Pindzia in July 2012, and Pindzia issued a letter of authorization "to proceed with this concept"—a seasonal event barn that was accessory to the primary use of the property as a single-family home—in August 2012. However, shortly after giving this approval, Pindzia began requesting more details about the project, particularly details about the "intensity" of the proposed use of the barn. Pindzia requested these details because, in his words, he "didn't have a written application to work from" and was unable to specify the scope of the

authorization.[5]  This request for clarification should have signaled to Daniel that all might not be well with his planned use of the barn.

Daniel's subsequent responses to Pindzia's requests also raise a question as to whether his reliance was reasonable.  Daniel indicated, in response to Pindzia's questions, that he was planning to use the barn to host events year-round.  He did so despite Pindzia's earlier statement that he anticipated the barn to be an accessory use if it were used to host *seasonal* events.  Indeed, the approval Pindzia gave was for "this concept"; Pindzia described the concept as a "seasonal" use of the event barn for events "typically scheduled for the warmer months."  Daniel's decision to stray from the type of limited in scope, "incidental and subordinate to the single-family dwelling" use approved by Pindzia discounts the notion that he reasonably relied on Pinzdia's approval.

Furthermore, as the majority notes, the September 18, 2012 e-mail to Daniel from Kingsley should have signaled a potential problem to Daniel and further discounts the idea that his reliance on Pindzia's earlier approval was reasonable.  Kingsley specifically stated that township board members "have raised a number of questions about this change in use—more questions than we have answers."  Kingsley expressly told Daniel that he did not wish for the latter to close on the property "with the feeling that you would be permitted to do as you have proposed without *many things being clarified*."  This was an express warning that Daniel should not continue with the project thinking he could use the barn in the manner he was proposing.  Yet, despite this warning, Daniel proceeded forward with the project in an effort to use the barn as he had proposed to do.  Moreover, as noted by the trial court, with each successive revision of the building permit, the project became more substantial and significant, evidencing an ever expanding use above and beyond the initially understood concept by Pindzia that this was to be an accessory use to the permitted use as residential property.

Accordingly, I agree with the majority that defendants cannot establish the element of reasonable reliance.  That is not to say, however, that the rest of the players involved in this case are blameless.  For instance, the county issued, at the township's behest, several building permits to Daniel.  The township urged the county to do so despite the fact that Daniel responded to Pindzia's inquiries by stating that he intended to use the barn in a year-round fashion for hosting numerous events.  Also, according to Daniel's affidavit, the barn was located within 1/4 mile of township offices, and many officials walked through the barn during the construction phase.  Pindzia himself admitted, in his July 22, 2013 e-mail, that "[m]assive construction improvements have been made."  Yet, despite having at least some knowledge of the massive improvements Daniel was making to the barn—and by implication, that he likely intended to lease the barn in a manner so as to recoup his expenses—township officials apparently saw fit to allow construction to continue for a period of time.  Nevertheless, because defendants cannot show reasonable reliance in light of the entirety of the circumstances, their equitable estoppel claim must fail.

---

[5] As noted above, the record reveals that Daniel did not comply with zoning requirements about submitting an application and site plan for his proposed use.  Daniel is charged with having knowledge of these zoning requirements.  See *Hughes*, 284 Mich App at 78.

### III. ACCESSORY USE

I also agree with the majority's conclusion that the particular use of the barn by defendants, i.e., a year-round leasing facility designed to host numerous events, is not an accessory use under the zoning ordinance. I note, however, that neither this Court nor the trial court was asked to weigh in on whether a far more limited in scope use of the barn, such as for occasional weddings and gatherings in a manner that is truly incidental and subordinate to the primary use of the property as residential, is nevertheless permitted.[6] The parties did not seek such a determination. Thus, our ruling should not be construed so as to preclude any use of the barn in a manner that qualifies as an accessory use under the applicable zoning ordinance.

In all other respects, I concur with the majority opinion.

/s/ Jane M. Beckering

---

[6] The trial court's final judgment declared that defendants were "permanently enjoined from operating as a *commercial* hosting operation ("event barn") as *historically done by Cottonwood Barn, LLC . . .*" (emphasis added). As the trial court aptly noted, "no preliminary certificate would have been necessary had the event barn really been an accessory use to the residential use of the property. The record shows that the event barn became the principal or primary use, and it was, in fact a change in the type of use. . . of the property." This, in my opinion, does not preclude a lesser use of the barn, should the lesser use be determined to fit within the parameters of an "accessory use" under applicable zoning ordinances.